## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONNA MOORE and FRENCHOLA HOLDEN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs <br><br> v. <br><br> GMAC MORTGAGE, LLC, GMAC BANK and CAP RE OF VERMONT, INC., <br><br> Defendants. | Case No.:  07-cv-04296 <br><br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Donna Moore and Frenchola Holden ("Plaintiffs"), on behalf of themselves and a class of all others similarly situated, allege as follows:

### INTRODUCTION

1.     Defendants are each subsidiaries of GMAC LLC, one of the nation's largest financial services companies. GMAC Mortgage, LLC and GMAC Bank, together with certain participating subsidiaries and/or affiliates, and under various trade names (collectively referred to herein as "GMAC " or the "Company") have acted in concert with their affiliated reinsurer, Cap Re of Vemont, Inc. ("Cap Re of Vermont") to effectuate a scheme whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal referral payments in the form of purported reinsurance premiums are paid by private mortgage insurers to Cap Re of Vermont; and (b) Defendants receive an unlawful split of private mortgage insurance premiums paid by borrowers of GMAC and its correspondent lenders.

2.      This is a proposed national class action brought by Plaintiffs on behalf of themselves and a class of all similarly situated homeowners who obtained residential mortgage loans through GMAC and paid for private mortgage insurance issued by insurers with whom GMAC had captive reinsurance arrangements.

3.      Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance. Private mortgage insurance protects the lender in the event of a default by the borrower. The premium is paid by the borrower and is usually collected by the lender with the borrower's monthly payments. Borrowers typically have no opportunity to comparison-shop or select the private mortgage insurer.

4.      Section 2607 of RESPA prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance. Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home.

5.      GMAC has attempted to circumvent RESPA's prohibition against accepting kickbacks and unearned fees by arranging for private mortgage insurers to pay an excessive portion of the private mortgage insurance premiums of borrowers—referred by GMAC—to Cap Re of Vermont in the form of purported reinsurance premiums.

6.      While these payments to GMAC's affiliated reinsurer were purportedly for "reinsurance" services, Cap Re of Vermont received these payments while assuming very little or no actual risk. For instance, since 1999, GMAC's captive reinsurer has received over $114 million from leading primary mortgage insurers as its "split" of borrowers'

mortgage insurance premiums--$33 million in 2005 alone. In stark contrast, its actual insurance losses as reflected in the total amount of claims paid with respect to such premiums were zero. In other words, the millions of dollars collected by Defendants through the captive reinsurance arrangements far exceeded the value of any services rendered by Cap Re of Vermont.

7.      This scheme constitutes disguised, unlawful referral fees in violation of RESPA's prohibition against kickbacks, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 2614.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and/or the real property involved in one or more of Plaintiffs' mortgage loan transactions is located in this district.

## PARTIES

### Plaintiffs

10.     Plaintiff Donna Moore resides in Philadelphia, Pennsylvania. Plaintiff Moore obtained a residential mortgage loan from GMAC in April of 2006 for the purchase of a home, with a downpayment of less than 20%, and was required to pay for primary mortgage insurance. Plaintiff Moore paid for primary mortgage insurance from an insurer with whom GMAC had a captive reinsurance arrangement.

11.     Plaintiff Frenchola Holden resides in Philadelphia, Pennsylvania.   On February 8, 2007, Plaintiff Holden obtained a residential mortgage loan from GMAC Mortgage, LLC, with greater than 80% loan-to-value ratio, and was required to pay for private mortgage insurance from a provider selected by GMAC.   Plaintiff Holden did not select her private mortgage insurer, and, further, at closing, was not even informed of the identity of her private mortgage insurer.   Plaintiff Holden paid for private mortgage insurance from an insurer with whom GMAC had a captive reinsurance arrangement and, further, Plaintiff Holden's loan was included in a pool of loans reinsured through Cap Re by her private mortgage insurer.

### Defendants

12.     Defendant GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation) is a Delaware limited liability company with its principal place of business located in Horsham, Pennsylvania. Defendant GMAC Mortgage, LLC conducts business in this district and throughout the United States.

13.     Defendant GMAC Bank is a bank chartered with the state of Utah. GMAC Bank operates throughout the United States.

14.     Defendant Cap Re of Vermont is a Vermont corporation that conducts business throughout the United States.

15.     The corporate structure of the GMAC mortgage group is rather complex. Upon information and belief, Cap Re of Vermont is a subsidiary of GMAC Mortgage, LLC. GMAC Mortgage, LLC is a subsidiary of GMAC Residential Holding Company, LLC, a subsidiary of Residential Capital, LLC, which is a subsidiary of GMAC Mortgage Group, LLC. GMAC Mortgage Group, LLC is a subsidiary of GMAC LLC. GMAC

4

Bank is owned by GMAC LLC and Residential Capital, LLC. Plaintiffs reserve the right to amend this complaint to add additional corporate members of the GMAC mortgage group.

## FACTUAL ALLEGATIONS

### GMAC's Mortgage-Lending Operations

16.     GMAC is one of the nation's largest residential mortgage lenders. The Company obtains residential mortgage loans through multiple channels.

17.     GMAC originates loans through a direct lending network consisting of retail branches, telephone operations and internet sites, as well as referrals from realtors, homebuilders, credit unions, small banks, affinity groups and other referral sources. GMAC's direct lending network includes, among others, operations under the brands "GMAC Mortgage" and "ditech.com."

18.     Additionally GMAC sources mortgage loans through mortgage brokers. Loans originated through mortgage brokers are funded by GMAC and generally closed under the "GMAC Mortgage" name. GMAC reviews and underwrites the application, approves or denies the application, sets the interest rate and other terms of the loan. Additionally, GMAC qualifies and approves outside mortgage brokers through whom it originates mortgage loans and, further, continuously monitors their performance. 2006 ResCap 10-K.

19.     In addition to originating loans through its direct lending network and its network of mortgage brokers, GMAC purchases loans from correspondent lenders. In addition to qualifying and approving its correspondent lenders, GMAC requires its

correspondent lenders to originate loans in accordance with the procedures of its loan programs. 2006 ResCap 10-K.

20. Through its mortgage division, GMAC Bank provides funding for residential mortgage loans originated by the GMAC mortgage group. GMAC Bank also provides residential mortgage loan and home equity loans to consumers through its internet website www.gmacbank.com, and participates in the acquisition of mortgage loans from GMAC's correspondent lenders. 2006 ResCap 10-K.

21. Cap Re of Vermont enters into agreements to provide purported reinsurance services to primary private mortgage insurance providers with respect to mortgage loans originated by GMAC and its correspondent lenders.

22. The majority of loans originated by the Company are bundled, securitized and sold to investors on the secondary market. Together with its affiliates, GMAC is also one of nation's largest issuers of mortgage-backed and mortgage-related asset-backed securities.

### Private Mortgage Insurance Industry

23. In order to lessen risk of default, lenders typically prefer to finance no more than eighty percent of the value of a home, with the remaining twenty percent being paid as a down payment by the borrower. In the event of a default, the lender is then more likely to completely recover its investment.

24. Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home. Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a

dependable third party -- the private mortgage insurer -- to protect the lender in the event of a default by the borrower.

25.    Private mortgage insurers are typically unaffiliated third-party companies who agree to cover the first twenty to thirty percent of the amount of the potential claim, including unpaid principal, interest and certain expenses.

26.    The amount of private mortgage insurance coverage required varies according to the perceived risk of default. The lower the percentage of the borrower's down payment, the more mortgage insurance required. For example, more private mortgage insurance is required with a five percent down payment than with a fifteen percent down payment. Additionally, more private mortgage insurance may be required for adjustable-rate mortgages than for fixed-rate mortgages.

27.    While the lender is the beneficiary of the private mortgage insurance, the borrower pays the premiums, usually through an addition to the borrower's monthly mortgage payment.

28.    Borrowers generally have no opportunity to comparison-shop for private mortgage insurance. The private mortgage insurer is selected by the lender. The terms and conditions of the insurance policy, as well as the cost of the policy, is determined by the lender and the private mortgage insurer rather than negotiated between the borrower and the private mortgage insurer.

29.    The private mortgage insurance industry began with the founding of Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and is dominated by MGIC and other companies, including, without limitation: PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation, Radian Guaranty Inc., United Guaranty

Residential Insurance Company, Triad Guaranty Insurance Company and Republic Mortgage Insurance. The industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA").

30.     According to MICA, new private mortgage insurance contracts for its member firms have consistently exceeded $200 billion per year since 1998. MICA firms issued over 1.5 million new certificates of mortgage insurance in 2005, representing over $225 billion in new insurance written.

31.     Private mortgage insurance is limited to the conventional home loan market. Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration and the Veterans Administration, maintain their own form of mortgage default insurance.

**RESPA Prohibits Kickbacks for Referrals and**
**Fee-Splitting Related To Private Mortgage Insurance Policies**

32.     RESPA is the primary federal law regulating residential mortgage settlement services. The United States Department of Housing and Urban Development ("HUD") is charged with enforcing RESPA. HUD has promulgated the implementing rules for RESPA. See Regulation X, 24 C.F.R. § 3500.

33.     RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers. "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result... (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

34.     A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

35.   In 12 U.S.C. 2607(a) RESPA provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

36.   In 12 U.S.C. 2607(b) RESPA provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

37.   Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

38.   The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity...The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

39.   Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a). The term "settlement service" is

9

liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance." 24 C.F.R. § 3500.2(b).

40.     Under RESPA, therefore, GMAC is prohibited from accepting referral fees from a private mortgage insurer or from splitting private mortgage insurance premiums with the insurer other than for services actually performed by the captive reinsurer.

## Mortgage Reinsurance Industry

41.     Private mortgage insurers may enter into contracts with reinsurers, whereby the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans. In return, the private mortgage insurer pays to the reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

42.     Mortgage reinsurance arrangements can generally take two forms: (a) "quota share" and (b) "excess loss."

43.     In a quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses. Thus, if the private mortgage insurer experiences losses, the reinsurer is certain to experience losses in the percentage agreed upon in the reinsurance coverage.

44.     In an excess loss reinsurance arrangement, however, the reinsurer is liable only for claims, or a percentage thereof, above a particular ceiling. Unlike the quota share arrangement, the excess loss method does not necessarily result in any loss being shifted to the reinsurer.

45.     The likelihood of the reinsurer experiencing any losses under this arrangement depends not only on the amount of losses by the private mortgage insurance, but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer sets the excess loss level at an amount where the reinsurer bears actual risk of loss.

### Captive Mortgage Reinsurance Arrangements and HUD's Concern About RESPA Anti-kickback Violations Under Such Arrangements

46.     Lenders produce customers for private mortgage insurers. Certain lenders, seeking to capitalize on the billions of dollars their borrowers pay to these insurers in premiums each year, have established their own subsidiary or "captive" reinsurers. These captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates that require the borrower to pay for private mortgage insurance.

47.     Under "captive reinsurance arrangements," the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer. These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer.

48.     Captive mortgage reinsurance arrangements raise obvious RESPA kickback problems. Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the borrower's premium revenue through its captive reinsurer. The insurer stimulates its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

49.    Simply put, as opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, an unscrupulous lender can use a captive reinsurance arrangement to funnel such unlawful kickbacks.

50.    Concerned that these transactions would be designed to disguise a funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA's anti-kickback violations.

51.    The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services `actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original).

52.    The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk." HUD warned that "The reinsurance transaction cannot be a sham under which premium payments... are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."

53.    The HUD letter states "This requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in every claim" (emphasis in original).

54.    The HUD letter contrasts the excess loss method of reinsurance. HUD states that excess loss reinsurance contracts can escape characterization as a referral fee or fee-split only:

> ...if the band of the reinsurer's potential exposure is such
> that a reasonable business justification would motivate a

12

> decision to reinsure that band. Unless there is a real transfer
> of risk, no real reinsurance services are actually being
> provided. In either case, the premiums paid...must be
> commensurate with the risk.

55.     Notably, state insurance commissioners and federal regulators have investigated and condemned similar captive reinsurance arrangements in the title insurance industry as sham transactions designed to funnel unlawful kickbacks for business referrals. As a result, a number of providers have abandoned such arrangements altogether.

56.     The National Association of Insurance Commissioners ("NAIC") also has addressed the accounting treatment of premiums ceded to captive mortgage reinsurers. Under the annual statement requirements of the NAIC, private mortgage insurers should not treat as authorized reinsurance amounts ceded to lender-captive reinsurers where adequate risk is not transferred.  Rather, such amounts should be accounted for under the less beneficial deposit accounting guidelines and identified as though unauthorized accounting was being utilized.

### GMAC's Captive Reinsurance Arrangements

57.     In connection with the billions of dollars in home loans originated by GMAC, many of its borrowers pay for private mortgage insurance.

58.     Pursuant to "captive reinsurance arrangements," GMAC refers borrowers to private mortgage insurers, who agree to reinsure with Cap Re of Vermont. These insurers include at least: PMI Mortgage Insurance Company, Genworth Mortgage Insurance Corporation, Mortgage Guaranty Insurance Company, Radian Guaranty Inc., United Guaranty Residential Insurance Company, Triad Guaranty Insurance Company and Republic Mortgage Insurance.

59.    GMAC has a strong financial interest in steering business to private mortgage insurers who, in turn, agree to reinsure with Cap Re of Vermont on terms that will produce significant revenue to this member of the GMAC family. As of December 31, 2006, Cap Re of Vermont reinsurance agreements covering $14.2 billion in active original principal mortgage loans. 2006 ResCap 10-K.

60.    Cap Re of Vermont enters into reinsurance agreements solely with respect to loans originated by GMAC through its direct lending and mortgage broker networks, as well as loans originated by GMAC's correspondent lenders.

61.    Under GMAC's captive reinsurance arrangements, the primary insurer pays Cap Re of Vermont a percentage of the premiums paid by borrowers on a particular pool of loans; in return, Cap Re of Vermont purportedly agrees to assume a portion of the insurer's risk with respect to the loans involved.

62.    In fact, little or no risk is actually transferred from the primary insurer to Cap Re of Vermont in exchange for the insurer payments to Cap Re of Vermont. The actual risk, if any, transferred to Cap Re of Vermont is hardly commensurate with the premiums it extracts from the primary insurer.

63.    For example, since 1999 through 2005, GMAC's captive reinsurer collected from private mortgage insurers approximately $113,987,000 as its "share" of borrower's private mortgage insurance premiums. In contrast, its "share" of paid insured losses was zero:

| YEAR | PREMIUMS RECEIVED BY REINSURER | LOSSES PAID BY REINSURER |
|------|-------------------------------|--------------------------|
| 2005 | $32,943,000 | $0 |
| 2004 | $27,159,000 | $0 |

| 2003 | $19,222,000 | $0 |
|---|---|---|
| 2002 | $21,171,000 | $0 |
| 2001 | $12,442,000 | $0 |
| 2000 | $1,050,000 | $0 |
| **TOTAL:** | **$113,987,000** | **$0** |

64.     The numbers speak for themselves. This clear, disturbing pattern of excessive premiums compared to the actual transferred risk continued throughout 2006.

65.     As HUD noted during its recent testimony by Assistant Secretary for Regulatory Affairs and Manufactured Housing Gary M. Cunningham before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

66.     The millions of dollars collected by GMAC through its captive reinsurer have clearly not been commensurate to its actual risk exposure. GMAC has received millions of dollars in payments, while bearing little or no risk of loss.

67.     In reality, GMAC's captive reinsurance arrangements were and are sham transactions for collecting illegal kickbacks in return for referring private mortgage insurance business to certain insurers.

68.     The money GMAC collected through its captive reinsurer far exceeded the value of the services, if any, it performed. There was no real transfer of risk or, at least,

not a commensurate transfer of risk. The amounts paid were simply disguised kickbacks to GMAC for the referral of borrowers to private mortgage insurers.

69.     These arrangements keep premiums for private mortgage insurance artificially inflated because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders. In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for both actual private mortgage insurance coverage and private mortgage insurers' unlawful kickbacks to lenders.

70.     Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers. As a result, private mortgage insurance premiums incorporate the payment of such kickbacks -- to the detriment of consumers.

## CLASS ACTION ALLEGATIONS

71.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of a general class consisting of all persons who obtained residential mortgage loans originated and/or acquired by GMAC and/or its affiliates and, in connection therewith, purchased private mortgage insurance and whose loans were included within GMAC's captive mortgage reinsurance arrangements (the "Class").

72.     The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

73.     The Class is so numerous that joinder of all members is impracticable.

74.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

75.     Plaintiffs' claims are typical of the claims of the Class.

76.     There are questions of law and fact common to the Class, including but not limited to:

   a.     Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

   b.     Whether payments to GMAC's captive reinsurer were bona fide compensation and solely for services actually performed;

   c.     Whether payments to GMAC' s captive reinsurer exceeded the value of any services actually performed;

   d.     Whether GMAC's captive reinsurance arrangements constituted unlawful kickbacks from private mortgage insurers;

   e.     Whether Defendants accepted a portion, split or percentage of borrowers' private mortgage insurance premiums other than for services actually performed; and

   f.     Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA § 2607(d)(2).

77.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

78.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex nationwide class action litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

79.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants.

80.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, be diapositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

81.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

82.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT I

## Violation of RESPA, 12 U.S.C. 2607

83.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

84.    Throughout the Class Period, GMAC and the private mortgage insurers involved in the captive reinsurance arrangements described herein provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3). Further, the private mortgage insurance premiums paid by Plaintiffs and the Class constituted fees for settlement services.

85.    The amounts received by Defendants through the captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

86.    Plaintiffs and the Class obtained federally-related residential mortgage loans through GMAC and paid millions of dollars for private mortgage insurance premiums in connection with their real estate closings. Defendants arranged for an unlawfully excessive split of borrowers' premiums to be paid to Cap Re of Vermont.

87.    The millions of dollars in premiums accepted from private mortgage insurers: (a) were not for services actually furnished or performed; and/or (b) exceeded the value of such services.

88.    The millions of dollars accepted by GMAC through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements with private mortgage insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers. Such practice violated RESPA, 12 U.S.C. 2607(a). Cap Re of Vennont—GMAC's subsidiary— participated in the scheme and served as the direct conduit by which the kickbacks were funneled. Cap Re of Vermont agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs and the Class.

89.     In connection with transactions involving federally-related mortgage loans, Defendants accepted a portion, split or percentage of charges received by private mortgage insurers for the rendering of real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b). The money paid by private mortgage insurers to GMAC and accepted by GMAC through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by GMAC's customers. Cap Re of Vermont – GMAC's subsidiary – participated in the scheme and served as the direct party to which the unlawful split was paid. Cap Re of Vermont agreed to provide purported "reinsurance" services involving mortgage insurance paid by Plaintiffs and the Class.

90.     Defendants' unlawfully-orchestrated captive reinsurance scheme involved loans originated by GMAC through its direct lending network and its mortgage broker network, as well as loans originated from GMAC's correspondent lenders. 2006 ResCap 10-K. In fact, upon information and belief, GMAC requires its correspondent lenders to participate in the captive reinsurance arrangements.

91.     Plaintiffs and the Class were harmed by Defendants' unlawful scheme.

92.     First, Plaintiffs and the Class were overcharged for mortgage insurance. Under GMAC's scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to GMAC's captive reinsurer that far exceeded the value of any services performed and, were, in fact, illegal referral fees.

93.     Second, regardless of whether Plaintiffs and the Class were overcharged for private mortgage insurance and regardless of the reasonableness or unreasonableness

of the rates Plaintiffs paid for private mortgage insurance, under RESPA, Plaintiffs and

the Class were, as a matter of law, entitled to purchase settlement services from providers

that did not participate in unlawful  kickback and/or fee-splitting schemes and are entitled

to recover from GMAC statutory damages in an amount equal to three times the amount

they paid for private mortgage insurance.

94.    Defendants therefore violated RESPA, 12 U.S.C. 2607. Pursuant to

RESPA, 12 U.S.C. 2607(d), Defendants are liable to Plaintiffs and the Class in an amount

equal to three times the amounts they have paid or will have paid for private mortgage

insurance as of the date of judgment.

95.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiffs also seek

attorneys' fees and costs of suit.

## TOLLING OF STATUTE OF LIMITATIONS

96.    Defendants knowingly and actively concealed the basis for the Plaintiffs'

claims by engaging in a scheme that was, by its very nature and purposeful design, self-

concealing. Due to the complex, undisclosed and self-concealing nature of GMAC's

scheme to collect illegal kickbacks from private mortgage insurers, Plaintiffs and the

Class could not reasonably have discovered the underlying basis for the claims alleged

herein.

97.    Further, GMAC engaged in affirmative acts to conceal the facts and

circumstances giving rise to the claims asserted herein. GMAC affirmatively represented

to Plaintiffs and the Class that any amounts it received from its captive reinsurance

arrangements were for services actually performed. Pursuant to RESPA § 2604(c) and the

accompanying regulations set forth in 24 C.F.R. 3500.7, if GMAC required the use of a

particular provider of settlement service, it was obligated to describe the nature of any relationship between GMAC and such provider. GMAC failed to satisfy its disclosure obligations by impermissibly misrepresenting the true nature of its captive reinsurance arrangements with private mortgage insurers—particularly the fact that the amounts that Plaintiffs and the Class would pay to such insurers included payments to GMAC's captive reinsurer in excess of the value of any services rendered.

98.     GMAC provided misleading information to Plaintiffs and the Class, thus affirmatively acting to conceal its unlawful kickback scheme. By funneling kickbacks through Cap Re of Vermont and representing that such payments were for services actually performed,  rather than referral fees, GMAC acted to conceal and prevent Plaintiffs from discovering the underlying basis for this action.

99.     Accordingly, Plaintiffs and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Plaintiff or Class member.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.     This action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.     The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C. Plaintiffs and the Class be awarded statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D. An order granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and expenses; and

E. An order granting Plaintiffs and the Class such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated: May 27, 2008     **SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**

<p style="margin-left:40%;">JHM6596_____<br>
Joseph H. Meltzer, Esq.<br>
Edward W. Ciolko, Esq.<br>
Mark K. Gyandoh, Esq.<br>
Joseph A. Weeden, Esq.<br>
James A. Maro, Esq.<br>
280 King of Prussia Road<br>
Radnor, PA 19087<br>
Telephone: (610) 667-7706<br>
Facsimile: (610) 667-7056</p>

<p style="margin-left:40%;">-and-</p>

<p style="margin-left:40%;">Alan R. Plutzik, Of Counsel<br>
2125 Oak Grove Blvd., Suite 120<br>
Walnut Creek, CA 94598<br>
Telephone: (925) 945-0770<br>
Facsimile: (925) 945-8792</p>

<p style="margin-left:40%;"><strong>BERKE, BERKE & BERKE</strong><br>
Andrew L. Berke, Esq.<br>
420 Frazier Avenue<br>
Chattanooga, TN 37402<br>
Telephone: (423) 266-5171<br>
Facsimile: (423) 265-5307</p>

**TRAVIS & CALHOUN, P.C.**
Eric G. Calhoun, Esq.
1000 Providence Towers East
5001 Spring Valley Road
Dallas, Texas 75244
Telephone: (972) 934-4100
Facsimile: (972) 934-4101

Sterling Deramus, Esq.
2015 First Avenue North
Birmingham, AL 35203
Telephone: (205) 458-1100
Facsimile: (205 328-6957

***Attorneys for Plaintiff***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DONNA MOORE and FRENCHOLA
HOLDEN, individually and on behalf of all
others similarly situated,

                       Plaintiffs,

      v.

GMAC MORTGAGE, LLC, GMAC BANK and
CAP RE OF VERMONT, INC.,

                       Defendants.

Case No.:  07-cv-04296

## CERTIFICATE OF SERVICE

      I hereby certify that on the 27th day of May, 2008, pursuant to the Court's Order

dated May 22, 2008 granting leave to file a Second Amended Complaint and directing

that same be filed by this date, a true and correct copy of Plaintiffs' Second Amended

Class Action Complaint was filed with the Clerk of the Court and served upon all counsel

of record by email and first-class mail:

                                     JHM 6596
                                     Joseph H. Meltzer
                                     Edward W. Ciolko
                                     Mark K. Gyandoh
                                     Joseph A. Weeden
                                     Attorneys for Plaintiffs