**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| DONNA MOORE, FRENCHOLA HOLDEN, and KEITH MCMILLON, individually and on behalf of all others similarly situated, | : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs, | :     Civil Action No. 2:07-cv-04296-PD <br> : |
| v. | : <br> : |
| GMAC MORTGAGE, LLC, GMAC BANK and CAP RE OF VERMONT, INC., | : <br> : <br> : |
| Defendants. | : <br> : <br> : |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

**REDACTED PURSUANT TO PARAGRAPH 16 OF THE COURT'S
CONFIDENTIALITY ORDER DATED MARCH 28, 2008 (DOCKET NO. 48).**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................ 1

SUMMARY OF ARGUMENT ............................................................................ 3

FACTUAL BACKGROUND ............................................................................... 5

    A.    Mortgage Insurance and Reinsurance ................................................. 5

           1.    Mortgage insurance protects lenders from certain losses
                  arising from borrower defaults. ................................................ 5

           2.    Mortgage insurance protects against catastrophic lender
                  losses occasioned by downturns in the overall economy
                  that are coupled with sharp housing price devaluations. ........... 8

           3.    Reinsurance allows an insurer to share or limit its risk,
                  and to lower its required capital. ............................................. 9

    B.    Cap Re's Reinsurance Business ......................................................... 10

    C.    Mortgage Insurance on the Plaintiffs' Loans ..................................... 15

    D.    Cap Re's Experience in Reinsuring the Pools of Mortgage
          Insurance Policies That Included Plaintiffs' Loans. ......................... 16

PROCEDURAL HISTORY ................................................................................ 19

SECTION 8 OF RESPA ..................................................................................... 22

ARGUMENT ...................................................................................................... 23

I.     MORTGAGE INSURANCE, LIKE OTHER POST-
       CLOSING SERVICES, IS NOT A "SETTLEMENT
       SERVICE" WITHIN THE SCOPE OF RESPA SECTION
       8, AND DEFENDANTS ARE THEREFORE ENTITLED
       TO SUMMARY JUDGMENT. .................................................... 24

II.    BECAUSE PLAINTIFFS PAID NO MORTGAGE
       INSURANCE PREMIUMS AT CLOSING,
       DEFENDANTS ARE ALSO ENTITLED TO SUMMARY
       JUDGMENT. ................................................................................. 28

    A.    Section 8 Applies Only to Settlement Service Charges
          Incurred or Paid At or Before a Closing. ......................................... 28

B.      Plaintiffs Paid No Mortgage Insurance Premiums At the
        Closing of Their Loans. ....................................................................31

III.    PLAINTIFFS CANNOT SHOW THAT THE PORTIONS
        OF THEIR MORTGAGE INSURANCE PREMIUMS
        CEDED TO CAP RE WERE ANYTHING OTHER THAN
        BONA FIDE COMPENSATION FOR REAL
        REINSURANCE. ............................................................................... 31

        A.      RESPA Does Not Preclude the Payment of Compensation
                for Goods, Services, or Facilities. ....................................................31

        B.      Plaintiffs Cannot Meet Their Burden of Showing the
                Compensation Paid to Cap Re for Reinsuring Their
                Mortgage Insurance Pools Was Unreasonable. ...............................32

IV.     PLAINTIFFS CANNOT PROVE THE CORE FACTUAL
        ALLEGATION OF THEIR COMPLAINT.............................................. 34

CONCLUSION.................................................................................................... 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*ACLU v. Schundler,*
168 F.3d 92 (3d Cir. 1999) ...........................................................................28

*Alston v. Countrywide Fin. Corp.,*
No. 07-3508, 2008 U.S. Dist. LEXIS 76763 (E.D. Pa. Sept. 29, 2008) .........27

*Alston v. Countrywide Fin.Corp.,*
585 F.3d 753 (3d Cir. 2009) .........................................................................27

*Asgrow Seed Co. v. Winterboer,*
513 U.S. 179 (1995) .......................................................................................25

*Badesha. v. GMAC LLC.,*
No. C06-7817 JCS (N.D. Cal. filed Dec. 20, 2006) .......................................19

*Bittinger v. Wells Fargo Bank N.A.,*
No. H-10-1745, 2010 U.S. Dist. LEXIS 107939 (S.D. Tex. Oct. 8, 2010) .....30

*Bloom v. Martin,*
865 F. Supp. 1377 (N.D. Cal. 1994), *aff'd*, 77 F.3d 318 (9th Cir. 1996) .........26, 30

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .......................................................................................34

*Culpepper v. Irwin Mortg. Corp.,*
253 F.3d 1324 (11th Cir. 2001) .....................................................................32

*Echevararia v. Chicago Title & Trust Co.,*
256 F.3d 623 (7th Cir. 2001) .........................................................................23

*Ellis v. Mobil Oil,*
969 F.2d 784 (9th Cir. 1992) .....................................................................31, 32

*Fitch v. Wells Fargo Home Mortg., Inc.,*
709 F. Supp. 2d 510 (E.D. La. 2010) ...........................................................24, 30

*Greenwald v. First Fed. Sav. & Loan Ass'n,*
446 F. Supp. 620 (D. Mass. 1978), *aff'd*, 591 F.2d 417 (1st Cir. 1979) .........27

*Hofstetter v. Chase Home Fin., LLC,*
No. C 10-01313 WHA, 2010 U.S. Dist. LEXIS 84050 (N.D. Cal. Aug. 13, 2010) .......25

*In re Hydrogen Peroxide Antitrust Litig.,*
552 F.3d 305 (3d Cir. 2008) ...........................................................................2

*Kay v. Wells Fargo & Co.*,
    247 F.R.D. 572 (N.D. Cal. 2007)...................................................................28

*McAnaney v. Astoria Fin. Corp.*,
    357 F. Supp. 2d 578 (E.D.N.Y. 2005) ..........................................................30

*McCulloch v. Hartford Life & Accident Ins. Co.*,
    363 F. Supp. 2d 169 (D. Conn. 2005).............................................................9

*McWhorter v. Ford Consumer Fin. Co., Inc.*,
    33 F. Supp. 2d 1059 (N.D. Ga. 1997)............................................................33

*Molosky v. Washington Mut. Bank*,
    Case No. 07-11247, 2008 WL 183634 (E.D. Mich. Jan. 18, 2008) ...............30

*Munoz v. PHH Corp.*,
    659 F. Supp. 2d 1094 (C.D. Cal. 2009) .........................................................28

*Newton v. United Cos. Fin. Corp.*,
    24 F. Supp. 2d 444 (E.D. Pa. 1998)...............................................................32

*Patton v. Triad Guaranty Ins. Corp.*,
    277 F.3d 1296 (11th Cir. 2002) ...............................................................27, 28

*PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*,
    394 F.3d 761 (9th Cir. 2005) ...........................................................................7

*Ramos v. Mortg. Elec. Registrations Sys.*,
    No. 2:08-cv-1089-ECR-RJJ, 2009 U.S. Dist. LEXIS 124874
    (D. Nev. Mar. 4, 2009) ..............................................................................32, 33

*Schmitz v. Aegis Mortg. Corp.*,
    48 F. Supp. 2d 877 (D. Minn. 1999)..............................................................33

*St. Luke's Hosp. v. Sebelius*,
    611 F.3d 900 (D.C. Cir. 2010)..................................................................31, 32

*Thomas v. Ocwen Fed. Bank FSB*,
    Case No. 01-4249, 2002 WL 99737 (N.D. Ill. Jan. 25, 2002).......................31

*United States v. Graham Mortg. Corp.*,
    740 F.2d 414 (6th Cir. 1984) ....................................................................26, 27

*Watt v. GMAC Mortg. Corp.*,
    No. 03-CV1179, 2005 U.S. Dist. LEXIS 42398 (W.D. Ark. Aug. 1, 2005) ...................30

*Wingert v. Credit Based Asset Servicing & Securitization, LLC*,
    No. 02-1973, 2004 U.S. Dist. LEXIS 25186 (W.D. Pa. Aug. 26, 2004)........................33

## STATUTES, RULES AND REGULATIONS

12 U.S.C.
    § 1454(a)(2) ...........................................................................................7
    § 1717(b)(2) ...........................................................................................7
    § 2602 ..................................................................................................25
    § 2602(3) ...............................................................................24, 25, 29
    § 2603(a) ...............................................................................................29
    § 2607 ....................................................................................................1
    § 2607(a) .........................................................................................22, 33
    § 2607(b) .........................................................................................22, 24
    § 2607(c) .....................................................................................3, 22, 31
    § 2617 ..................................................................................................23

11 C.F.R.
    § 113.19(h) (2010) ...............................................................................32

24 C.F.R.
    § 3500. ..................................................................................................29
    § 3500.2 .........................................................................................25, 26
    § 3500.2(1)) ..........................................................................................26
    § 3500.2(10) .........................................................................................26
    § 3500.4 ................................................................................................23
    § 3500.5(b)(7) ......................................................................................26
    § 3500.14(g)(2) ...............................................................................32, 33
    § 3500, app.A .......................................................................................29

42 C.F.R.
    § 411.357(l) & (p) ...............................................................................32
    § 414.802 ..............................................................................................32

## OTHER AUTHORITIES

Black's Law Dictionary
    (9th ed. 2009) .................................................................................25, 31

Quintin Johnstone, *Private Mortgage Insurance*, 39 Wake Forest L. Rev. 783, 789
    (2004)...............................................................................................7, 8, 9

*Real Estate Settlement Costs, FHA Mortgage Foreclosures, Housing Abandonment,*
    *and Site Selection Policies: Hearings on H.R. 13337: Hearings Before the*
    *Subcommittee on Housing of the Committee on Banking and Currency*, 92d
    Cong. 769 (1972) .................................................................................29

S. Rep. No. 93-866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546................................28, 32

**INTRODUCTION**

Plaintiffs' successive complaints have alleged that plaintiffs' lenders received "kickbacks" from the companies that provided mortgage insurance on plaintiffs' loans. They claim that the mortgage insurers paid "kickbacks" by entering into sham reinsurance agreements with Cap Re of Vermont, LLC ("Cap Re"), an affiliate of the lenders, under which Cap Re would receive a portion of the mortgage insurance premium in exchange, plaintiffs claim, for nothing.  They claim that the reinsurance agreements between the mortgage insurers and Cap Re expose Cap Re to absolutely no risk whatsoever, and that this construction of the contracts is "confirmed" because, plaintiffs assert, over a ten-year period, Cap Re has taken in millions of dollars of reinsurance premiums, but *paid out zero dollars in reinsurance claims*.  They claim that the alleged "kickbacks" violate Section 8 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607.

Nearly a year ago, plaintiffs sought to certify a class encompassing persons whose mortgage insurance with any one of seven mortgage insurers (not simply the insurers of plaintiffs' own mortgages) was reinsured at any time (not simply in the book year in which the mortgage insurance of plaintiffs' own loans was reinsured) under any reinsurance terms (not simply under the same terms applicable to the reinsurance of plaintiffs' mortgage insurance).  Plaintiffs blithely lumped all of Cap Re's reinsurance activities over a ten-year period into a single pot and asserted that it would be legally appropriate to permit plaintiffs, whose mortgage insurance was with United Guaranty Corporation ("UGI") in 2006 and 2007, to represent an "all insurer" class because "[t]he pertinent or predominate issue is that *no* losses have been paid by Cap Re under Defendants' common overriding scheme during the proposed class period."  (Dkt. No. 89 (Pls.' Reply Mem. of Law in Further Support of Mtn. for Class Certification) at 28 (emphasis in original).)  In opposing the class certification motion, defendants adduced evidence that plaintiffs' assertion was utterly false: as of February 8, 2010, and across all reinsurance arrangements for all time, Cap Re had paid ███████ in reinsurance claims.  Cap Re's actuary concluded that Cap Re would

1

eventually be presented with ███████████ of dollars of reinsurance claims.  (Dkt. No. 115, Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Class Certification, filed Feb. 8, 2010 ("Defs. Supp. Brief") at 2-3.)

The Court, as required by *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305 (3d Cir. 2008), very quickly focused on whether there was an enormous hole in plaintiffs' case, asking "if, in fact, the defendants have lost $300 million as a result of what you consider to be sham insurance arrangements[, w]here is your case?" (Dkt. No. 177 Declaration of Edward W. Ciolko in Support of Plaintiffs' Motion for Class Certification, filed Dec. 14, 2010 ("Ciolko Decl."), Ex. A. at 5.)  Plaintiffs were forced to admit that, if true, this "would seem to be fairly strong evidence that [Cap Re's reinsurance agreements] . . . [were] true insurance relationship[s]." (*Id*. at 6.)  The Court observed that if Cap Re's actual and projected reinsurance claims were accurate, "it takes all the air out of the balloon" of plaintiffs' case.  (*Id*. at 24.)  The Court stated that these claims were something it "wanted to know [about] sooner rather than later," (*id*. at 24-25), and established a period of focused discovery concerning "the actual and projected losses incurred by Defendants," after which the Court would address their impact.  (Dkt No. 162 (Nov. 24, 2010 Order) at 1.)  The Court specifically alluded to a "motion for summary judgment by the defendants" based on any evidence so developed.  (Ciolko Decl. Ex. A. at 21; *see also id.* at 25-26, 29.)

That discovery has been taken, and it shows each of plaintiffs' "zero dollars paid," "no capital at risk," and "walk away" contentions to be spectacularly and indisputably wrong.  On projections that plaintiffs' experts *do not challenge*, Professor Tim Riddiough opines, based on data available through December 31, 2009, that ███████████
███████████████████████████████████████████████
███████████  (Declaration of Timothy Riddiough in Support of Defendants' Motion for Summary Judgment, filed Jan. 19, 2011, Ex. 1 ("Riddiough Report") Ex. 57A-G; Declaration of Elliott Grumer in Support of Defendants' Motion for Summary Judgment and Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, filed January 19, 2011

("Grumer Jan. 19, 2011 Decl.") ¶ 17.)  Actual experience since December 31, 2009 has borne those projections out.  Through the end of the third quarter of 2010, *Cap Re has already **paid** mortgage insurers* ▮▮▮▮▮▮ on reinsurance claims.  (Grumer Jan 19, 2011 Decl. ¶ 3.)  And, as shown below, plaintiffs' "no capital at risk" and "walk away" allegations are misrepresentations of the terms of the actual agreements.  It's not that there's no air in plaintiffs' balloon — there's no balloon at all; just hot air.

## SUMMARY OF ARGUMENT

The Court has invited a summary judgment motion, and defendants now bring one against plaintiffs Donna Moore, Frenchola Holden, and Keith McMillon in their individual capacities.  To avoid successive motions on different grounds and to establish a complete record, defendants do not here simply debunk the "zero dollars" assertion in plaintiffs' complaints, but rather present several independent bases on which summary judgment should be granted on defendants' behalf:

- First, plaintiffs complain only about the placement with particular mortgage insurance providers of the mortgage insurance on their loans.  Since, as a matter of law, mortgage insurance is not a "settlement service" within the meaning of RESPA Section 8, plaintiffs have no RESPA claims.

- Second, even if mortgage insurance could be deemed a RESPA "settlement service" when paid for at "settlement," plaintiffs have no claims, since, as a matter of undisputed fact, none of them paid for mortgage insurance at the settlement of their loans.

- Third, even if plaintiffs could somehow get around the foregoing two issues, plaintiffs cannot establish that the premiums ceded with respect to their loans were anything other than bona fide compensation for services actually performed.  12 U.S.C. § 2607(c).



○ ███████████ Reinsuring Mr. McMillon's loan resulted in a spectacular loss to Cap Re.

○ ███████████ The "service" rendered by Cap Re to UGI is thus more valuable than the payments Cap Re received from UGI, and those payments thus presumptively represent bona fide compensation.  As with Mr. McMillon, reinsuring Ms. Moore and Ms. Holden's loans resulted in a spectacular loss to Cap Re.

- Fourth, the factual basis of every complaint filed in this action since its inception is plaintiffs' "zero dollars paid" allegation.  That allegation has now undisputedly been proven false.

---

[1] Defendants move for summary judgment only against plaintiffs in their individual capacities.  Plaintiffs' individual claims depend on whether the placement of the "service" with respect to *their* loans was procured through the payment of something other than bona fide compensation for services.  In the prior class certification proceeding, plaintiffs trumpeted their "zero dollars paid" allegation with respect to Cap Re's entire reinsurance business as the supposed classwide proof of RESPA liability.  Defendants responded that plaintiffs' premise was false—aggregate reinsurance claims were projected to be in the hundreds of millions and thus Cap Re's reinsurance business was clearly not a "sham." While this remains true, even more relevant to each plaintiffs' individual section 8 claims is the compensation that Cap Re received in connection with insuring *his or her* loan pool.

The independent bases for summary judgment are set out above in their logical progression, and in the order in which they are discussed below.  That ordering places the answer to plaintiffs' "zero dollars paid" allegation and the Court's "where is your case" question rather deep in the brief.  *See* Part IV below.  Plaintiffs' inability to prove the "zero dollars paid" allegation (*see* pp. 34-35) is perhaps the simplest basis on which summary judgment might be granted.  Nearly as simple is the basis that plaintiffs paid no mortgage insurance premiums at the settlement of their loans.  (*See* pp. 31-34.)  Additionally, the first basis for summary judgment — that mortgage insurance is not a settlement service (*see* pp. 24-28) — is a purely legal question of broad significance.  Should the Court determine summary judgment is appropriate on any one of the asserted grounds, it need not reach the others.

## FACTUAL BACKGROUND

**A.      Mortgage Insurance and Reinsurance.**

**1.      Mortgage insurance protects lenders from certain losses arising from borrower defaults.**

As a practical (and in some states, a legal) matter, in the event of a borrower default, secured residential lenders can look only to sale of the real property security as a source of repayment of their loans.  Even where a lender has the legal right to obtain a deficiency judgment against a defaulting borrower, it is often pointless to do so, as the borrower defaulted because he had no other assets to use to meet loan payments.  This means that if the value of the home drops below the outstanding mortgage amount, the lender stands to lose some of the principal advanced in making the loan.  If the borrower stops making payments, the loan may go into foreclosure.  If at the end of the foreclosure process, the proceeds are insufficient to pay the outstanding loan, the lender cannot recover the deficiency from the borrower: it simply loses the difference between the loan amount and the foreclosure proceeds.  An example illustrates this point:



John and Jane Doe purchased a home in 2004 for $220,000, borrowing $200,000 of that amount from Local Bank.  They made regular payments for four years, gradually reducing their outstanding loan.  From 2004 through 2007, their home value increased, and the Does had "equity" in the property.  However, in 2008, both Does lost their jobs, and the real estate market collapsed.  Very quickly, the amount owed on the mortgage was higher than the home's value.  The Does were unable to make their mortgage payments, and their loan balance increased due to the addition of unpaid interest.  In 2009, Local Bank commenced foreclosure proceedings, and finally managed to sell the property in 2010.  Between the time of the Does' default and the eventual foreclosure sale, real property prices drifted downward.  As a result of those market conditions, Local Bank netted $175,000 at the foreclosure sale, a loss of $45,000 in principal and accrued interest.

Mortgage insurance protects lenders against precisely this kind of risk.  Mortgage insurance "covers a lender for losses incurred when a borrower defaults on the repayment of a mortgage loan and the collateral is not sufficient to make the lender whole."  *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d 761, 762 (9th Cir. 2005).  In a mortgage insurance policy, an insurance company (say, PMI) agrees to cover the lender's losses on foreclosure up to a specified limit (say, 20% of the original principal amount), in exchange for a monthly premium.  In the Does example, PMI and Local Bank might have agreed that if Local Bank foreclosed on the Does' loan and the net proceeds on foreclosure were less than the pre-default principal balance of the loan, PMI would pay Local Bank for its losses up to a maximum of $40,000 (20% $\times$ $200,000 — the  policy limits).  For this coverage, Local Bank would pay PMI a monthly premium of $100.

Generally, lenders require the protection of mortgage insurance when a borrower seeks to obtain a loan for more than 80% of the value of the home being purchased, because a higher loan-to-value ratio means greater risk to the lender of a default-related loss on the loan.  (TAC ¶¶ 24-27.)  By congressional mandate, in order to be saleable to Fannie Mae and Freddie Mac in the secondary market, mortgage loans for over 80% of the value of the property must generally be insured.  *See* 12 U.S.C. § 1717(b)(2); 12 U.S.C. § 1454(a)(2). While lenders are the beneficiaries and holders of the mortgage insurance policies, they often require reimbursement of the premiums from their borrowers.  (*See, eg.*, TAC ¶ 28.)

At present, seven mortgage insurance companies have issued substantially all of the private mortgage insurance in the United States:  Genworth Mortgage Insurance Corporation (formerly General Electric Mortgage Insurance), Mortgage Guaranty Insurance Corporation ("MGIC"), PMI Mortgage Insurance Co. ("PMI"), Radian Guaranty Inc. (formerly Amerin Guaranty Corporation), Republic Mortgage Insurance Company ("RMIC"), Triad Guaranty Insurance Corporation, and United Guaranty Corporation ("UGI").  *See* Quintin Johnstone, *Private Mortgage Insurance*, 39 Wake Forest L. Rev. 783, 789 (2004).

2.    **Mortgage insurance protects against catastrophic lender losses occasioned by downturns in the overall economy that are coupled with sharp housing price devaluations.**

Claims are made against mortgage insurance only when amounts realized by lenders in disposing of real property security are less than the outstanding principal amount of the lender's loan.  Lenders regularly experience serious borrower defaults, and hence regularly need to foreclose on mortgages.  Where home values have been rising for a number of years, foreclosures generally do not result in a loss of principal, and mortgage insurers are presented with few claims.  (*See, e.g*, Riddiough Report ¶ 41.)  When home values have fallen, though, foreclosures often result in lender losses, which vary directly with the extent of housing price devaluation.  (*Id.*)  Housing market trends thus affect both the frequency and the size of mortgage insurance claims.  The frequency of mortgage insurance claims is also affected by unemployment rates, since borrower defaults vary directly with unemployment rate.  (*See, e.g., id.* ¶ 29.)

Due to these factors, significant amounts of mortgage insurance claims tend to arise in clusters widely separated over time.  "[M]ortgage insurance is a cyclical business with peaks and valleys that are measured on time scales of years if not decades[.]"  (Riddiough Report ¶ 42.)  "U.S. housing markets historically have been characterized by periods of relative stability interspersed with periods of extreme volatility."  (*Id.* ¶ 32; *see also id.* ¶ 29.)  In periods of "relative stability," mortgage insurance losses are modest.  Mortgage insurance operates principally to protect lenders against the risk of widely separated housing market disruptions:

> Mortgage insurance was established to enhance liquidity and stability in mortgage markets by creating mechanisms to transfer [borrower] default risk to third parties that were capable of bearing that risk.  This [borrower] default or credit risk is typically closely tied to the overall performance of the economy, where mortgage insurance was founded on the notion of the ***catastrophic risk of infrequent but severe housing crises*** (implying years if not decades of insignificant claims experience, followed by catastrophic loss). [footnote omitted.]  In fact, the modern mortgage insurance industry is structured almost entirely as a response to the experience of the Great Depression of the 1930s.  It was not created, as were

> other types of insurance companies, as an efficient way to
> manage certain types of risk that were generally unrelated to
> the performance of the overall economy.

(*Id.* ¶ 37.)  As one commentator noted before the recent housing slump began:  "A cloud that continues to hang over PMI [private mortgage insurance] companies' long histories is their catastrophic loss record in certain severe and protracted past housing recession periods. . . . PMI companies have been in serious financial trouble in some past severe housing recession periods."  *See* Johnstone, *supra*, 39 Wake Forest L. Rev. at 807-08.

### 3.   Reinsurance allows an insurer to share or limit its risk, and to lower its required capital.

"[R]einsurance agreements are common in the insurance industry and are regularly entered into without consequence."  *McCulloch v. Hartford Life & Accident Ins. Co.*, 363 F. Supp. 2d 169, 182 (D. Conn. 2005).  In addition to providing risk mitigation, reinsurance agreements provide the mortgage insurers with capital relief, as the agreements tend to reduce the amount of capital reserves the mortgage insurer is required by regulators to maintain for potential losses.  (Dkt. No. 86 Declaration of Elliott Grumer in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, filed July 22, 2008 ("Grumer Decl.") ¶ 7; Declaration of Wendy M. Garbers in Support of Defendants' Motion for Summary Judgment and Defendants' Opposition to Plaintiffs' Motion for Class Certification, filed Jan. 19, 2011 ("Garbers Jan. 19, 2011 Decl.") Ex. 4 [MGIC] at 231:4- 232:5, Ex. 5 [PMI] at 49:24-50:24 ███████████████████████████ ████████████████████████████").)  This is because the mortgage insurer receives credit for the capital reserves the reinsurer is required to maintain to cover potential losses.  (*See* Grumer Decl. ¶ 7; Garbers Jan. 19, 2011 Decl. Ex. 4 [MGIC] at 231:12-17.)

Mortgage insurers lay off mortgage insurance risk to reinsurers using a number of different contractual arrangements.  The types of arrangements to which defendant Cap Re was a party were "excess of loss" agreements.  (Riddiough Report ¶ 45).  These arrangements cover "pools" of loans.  Under a typical "excess of loss" agreement, the reinsurer owes the mortgage insurer nothing unless and until the reinsured pool sustains

losses (i.e., payments to lenders) aggregating an agreed amount, say 5% of the dollar value of the insured portions of the loans (i.e., the aggregate dollar value of the mortgage insurer's policy limits).  Once aggregate losses cross that threshold (the "attachment point"), the reinsurer indemnifies the insurer for all further losses up to an agreed amount (the "limits"), say 15% of the amount insured.  If the pool sustains losses in excess of the reinsurance limits, those losses fall again on the mortgage insurer, up to the limits of the mortgage insurance.  To compensate the reinsurer for taking this risk, the mortgage insurer pays ("cedes to") the reinsurer a portion of the premiums paid on the mortgage insurance.

To illustrate, consider a pool of 5,000 loans similar to the $200,000 loan made to the Does, aggregating $1,000,000,000.  On each loan, the mortgage insurer covers against losses of up to 20% of each loan amount, or $200,000,000 in the aggregate.  For this insurance, the mortgage insurer receives an average premium of $100 per month, totaling $6,000,000 per year.  The mortgage insurer cedes 40% of those premiums, or $2,400,000 per year, to the Reinsurer under an excess of loss arrangement.  The attachment point under that contract is 4% of the amount insured, and the detachment point is 14% of the amount insured.  In this arrangement, the Reinsurer would be liable to the insurer for losses in the pool exceeding $8 million ($4\% \times \$200,000,000$), but for no more than $20 million (($14\% - 4\%) \times \$200,000,000$).  Since the mortgage insurer does not insure the entire amount of the insured loan, the mortgage insurer need not pay claims representing 4% of the *face value* of the pooled loans before reinsurance is triggered.  In this example, the reinsurance obligation is triggered once the lender's losses exceed .8% of the face value of its loans (20% (extent of insurance) $\times$ 4% (mortgage insurer's retained layer)).

### B.     Cap Re's Reinsurance Business.

Defendant Cap Re is a subsidiary of defendant GMAC Mortgage, LLC ("GMAC Mortgage").  Cap Re is a reinsurance company organized under the laws of Vermont and regulated by that state's Department of Banking, Insurance, Securities & Health Care Administration.  As required by Vermont law, Cap Re has regularly certified to that

Department that it maintains the capital reserves required of reinsurers under Vermont law. (Grumer Decl. ¶ 5.)  Cap Re has a reinsurance agreement with each of the seven mortgage insurance companies.  (*Id.* ¶ 8 & Dkt. No. 87, Grumer Decl. Exs. 2A-2G.)  Cap Re's reinsurance contracts are structured as "excess of loss" contracts.

Under each of Cap Re's reinsurance agreements, mortgage insurance policies are grouped into reinsurance pools, generally by "book years," consisting of mortgage insurance policies issued by the mortgage insurer on certain loans made that calendar year.  (Grumer Decl. ¶ 6.)  Whether or not the mortgage insurer's losses have met the attachment point for reinsurance is determined on a book year basis.  In other words, an insurer with a 4% attachment point stands to collect from Cap Re with respect to any book year in which the insurer's losses exceed 4% of that book's insured risk, even if all losses from all book years are less than 4% of the aggregate insured risk.

That said, plaintiffs' repeated assertions that Cap Re does not have any of its own capital at risk are false.  (Dkt. 180 Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, filed Dec. 15, 2010 ("Class Cert. Mem.") at 5 (claiming the "contracts operated as little more than deposit accounts"), 18 (claiming that Cap Re was "playing the with the house's money"), and 32 (claiming that "Cap Re [wa]s under no obligation to fund the trusts" (citing Ciolko Decl. Ex. V at 23).)  This is simply not how the reinsurance agreements worked





████████████████████████████████████
██████████████████████████████████████4

### C.      Mortgage Insurance on the Plaintiffs' Loans.

Plaintiff Donna Moore obtained a loan from GMAC Bank in April 2006, to purchase a home.  (Garbers Jan. 19, 2011 Decl. Ex. 1 at 40:18-41:16; TAC ¶ 10.)  Because Ms. Moore made a down payment of only 10%, GMAC Bank required that her loan carry mortgage insurance, which was supplied by UGI.  (Garbers Jan. 19, 2011 Decl. Ex. 1 at 43:2-16; Grumer Decl. ¶ 9.)  Although GMAC Bank, as the policyholder, was obligated to pay the premium to UGI, Ms. Moore was required to reimburse GMAC Bank.  Ms. Moore did not begin making premium payments on her mortgage insurance policy until after the closing of her loan; GMAC Bank did not require any mortgage insurance to be prepaid in order to close the loan.  (Garbers Jan. 19, 2011 Decl. Ex. 1 at 26:12-27:14.)  UGI placed the mortgage insurance policy with respect to Ms. Moore's loan into the 2006 book year pool that it reinsured with Cap Re.  (*See* Grumer Decl. ¶¶ 6, 9.)

Plaintiff Frenchola Holden obtained a loan from GMAC Mortgage in February 2007, to purchase a home.  (Garbers Jan. 19, 2011 Decl. Ex. 2 at 26:8-10; TAC ¶ 11.)  Because Ms. Holden made a down payment of less than 5%, GMAC Mortgage required that her loan carry mortgage insurance, which was supplied by UGI.  (Garbers Jan. 19, 2011 Decl. Ex. 2 at 28:16-19, 31:6-32:19; Grumer Decl. ¶ 9.)  Although GMAC Mortgage, as the



policyholder, was obligated to pay the premium to UGI, Ms. Holden was required to reimburse GMAC Mortgage.  Ms. Holden did not begin making any payments relating to the mortgage insurance policy until after the closing of her loan; GMAC Mortgage did not require any mortgage insurance to be prepaid in order to close the loan.  (Garbers Jan. 19, 2011 Decl. Ex. 2 at 45:5-46:22 & Holden Depo Ex. 4.)  UGI placed the mortgage insurance policy with respect to Ms. Holden's loan into the 2007 book year pool that it reinsured with Cap Re.  (*See* Grumer Decl. ¶¶ 6, 9.)



PMI placed the mortgage insurance policy with respect to Mr. McMillon's loan into the 2007 book year pool that it reinsured with Cap Re.  (*See* Dkt. No. 156 ¶ 2; Grumer Decl. ¶ 6.)

>   **D.    Cap Re's Experience in Reinsuring the Pools of Mortgage Insurance Policies That Included Plaintiffs' Loans.**

The attributes of the reinsurance pools into which plaintiffs' mortgage insurance policies were placed are as follows:



Plaintiffs and their experts do not dispute the ultimate loss projections submitted herewith in the declaration of Professor Riddiough.  (*See generally* Ciolko Decl. Exs. V & NN.)  Professor Riddiough opines, based on information available as of December 31,

2009,[5] that for each book year relevant here, *Cap Re will, by the end of 2011, incur losses of*

████████████████████████. Cap Re's actual claims payment experience so far bears

those projections out.



_____

[5]Professor Riddiough relies, in his computations, on claims projections developed by the independent consulting actuaries Milliman, Inc. ("Milliman").  (Riddiough Report ¶ 7.)

████████████████████████████████████

████████████████████████████████

██████████████████████████████████

### PROCEDURAL HISTORY

This action has been pending for over four years.  Plaintiffs' initial complaint was filed in the Northern District of California in December 2006, by plaintiffs Karam Singh Badesha, Felicia Folmar, Lori Garrett, and Donna Moore.  (*Badesha et al. v. GMAC LLC*, *et al.*, No. C06-7817 JCS (N.D. Cal. filed Dec. 20, 2006) ("*Badesha*"), Dkt. No. 1.)  Only one of those four plaintiffs, Donna Moore, remains in this action.  Frenchola Holden was added as a named plaintiff in May 2008.  Keith McMillon was added as a named plaintiff in November 2010.

Each of plaintiffs' complaints has rested on the same flawed theory.  Plaintiffs allege that the fact that Cap Re had, at various times, received ceded reinsurance premiums but had not yet paid claims showed Cap Re's reinsurance business to be a "sham":

> Since 1999, GMAC, through its captive reinsurer, has collected from private mortgage insurers approximately **$113,987,000** as its 'share' of borrower's mortgage insurance premiums.  In contrast, its 'share' of paid losses was **zero**[.]  The numbers speak for themselves. . . .  In reality, GMAC's captive reinsurance arrangements were and are sham transactions[.]

(Compl. ¶¶ 63, 64, 67 (emphasis in original).)  This allegation was been repeated verbatim in the First Amended Complaint, filed in May 2007 (FAC ¶¶ 63, 64, 67), and the Second Amended Complaint filed in May 2008 (SAC ¶¶ 63, 64, 67), and with immaterial variation in the Third Amended Complaint filed in November 2010 (TAC ¶¶ 64, 65, 68).  Plaintiff Keith McMillon repeated the "zero dollars paid" theory at his deposition on December 10, 2010.  When asked the basis of his belief that "Cap Re has not taken on any risk," Mr. McMillon answered: "Because it appears as if no losses were paid by the reinsurer." (Garbers Jan. 19, 2011 Decl. Ex. 3 at 121:8-11.)  When asked if he had "any other basis" for that belief, he responded: "Not that I can think of, no."  (*Id.* at 121:13-14.)  In their class

certification papers filed on August 14, 2008, plaintiffs identified the "zero dollars paid" theory as the core of their case.  (Dkt. No. 89 (Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Class Certification), at 28 ("The pertinent or predominate issue is that *no* losses have been paid by Cap Re under Defendants' common overriding scheme during the proposed class period with respect to *any* of the pools of loans, to any of the 'MI Partners' with whom Cap Re contracted." (emphasis in original))

By the time plaintiffs moved for class certification in early 2010, the housing bubble had burst, and the recession was over two years old.  Mortgage insurer reinsurance claims against Cap Re were at that time like a freight train approaching from miles down the track: they hadn't arrived, but they would soon, at a reasonably estimable time, and when they did arrive, they would be huge.  Defendants adduced evidence, in opposition to the class certification motion, showing that Cap Re in fact *had* paid claims, and that in very short order, it would pay more claims in very substantial amounts.  (Dkt. No. 116 Supplemental Declaration of E. Grumer in Opposition to Motion for Class Certification, filed Feb. 8, 2010 ("Grumer Supp. Decl.") ¶¶ 6-7.)  That evidence showed plaintiffs' "sham reinsurance" theory to be nonsense.

At the class certification hearing on March 2, 2010, the Court asked plaintiffs' counsel whether plaintiffs would have a case if Cap Re stood to pay hundreds of millions of dollars in reinsurance claims, and counsel made a lawyerly concession:

> THE COURT:  Do you have a case if, in fact, the defendants have lost $300 million as a result of what you consider to be sham insurance arrangements?  Where is your case?
>
> * * *
>
> Doesn't that demonstrate that this is real?  If they're right now, when they say 'forecast', I'm not sure what that means, forecasts aren't always accurate, but I — if they are correct, and if they have incurred $400 million in losses, or they will incur $400 million in losses, doesn't that end the plaintiffs' case?  Isn't this really insurance?
>
> * * *

> If they are correct, if their forecast is correct, is there any
> question that this was [] genuine insurance?
>
> MS. SIEGEL-MOFFA:  I would—my gut reaction to that is,
> that would seem to be fairly strong evidence that it was a true
> insurance relationship[.]
>
> THE COURT:  Spoken like a true lawyer.
>
> *  *  *
>
> So that's really the—that's certainly a key question[.]
>
> MS. SIEGEL-MOFFA:  Certainly.

(Ciolko Decl. Ex. A (Transcript of March 2, 2010 Class Certification Hearing) at 5-6.)

Given the significance of whether Cap Re would in fact pay hundreds of millions of dollars in reinsurance claims, the Court encouraged the parties to engage in a focused period of discovery, during which plaintiffs would have the opportunity to test the accuracy of defendants' assertions.  As the Court reasoned:

> [I]f, in fact, the defendants can say, Oh yeah, we lost $300
> million on it, it does seem to me it takes all the air out of the
> balloon and it's something I want to know sooner—if it's
> true—I want to know sooner rather than later.

(*Id.* at 24-25.)  Accordingly, on March 16, 2010, the Court ordered the parties to "promptly engage in focused discovery . . . concerning the actual and projected loss information Defendants recently submitted[.]"  (Dkt. No. 123 (March 16, 2010 Order) at 1; *see also* Dkt. 162 (Nov. 24, 2010 Order) at 1 (noting that the Court had ordered a period of "limited discovery on the actual and projected losses incurred by Defendants").)

That period of focused discovery is now closed.  On July 30, plaintiffs served expert reports from their two experts:  J. David Cummins and Andrew Barile.  Neither of plaintiffs' experts disputed the Milliman projections on which defendants' actual and projected reinsurance claims information is based.  On October 4, 2010, defendants served their expert reports, including the report of Timothy Riddiough, who opined that Cap Re's ultimate losses were likely to be higher than those projected by Milliman.  (Riddiough Report ¶ 10.)  The evidence concerning Cap Re's projected ultimate reinsurance claims is thus undisputed.

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████

### SECTION 8 OF RESPA

RESPA prohibits the "referral" of "real estate settlement services" in exchange for a "kickback" or "split" of the settlement service fee.  Subsection 8(a) proscribes kickbacks:

> No person shall give and no person shall accept any fee, *kickback*, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a) (emphasis added).  Subsection 8(b) proscribes splits:

> No person shall give and no person shall accept any portion, *split*, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(b) (emphasis added).  However, 12 U.S.C. § 2607(c) qualifies subsections 8(a) and 8(b), stating that there can be no RESPA liability for *bona fide* compensation for services actually performed.

> Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed[.]

12 U.S.C. § 2607(c).

According to an opinion letter issued by Nicholas Retsinas, the Assistant Secretary for Housing at HUD, the agency charged with enforcing RESPA, Section 8 permits captive reinsurance arrangements:

> The Department[ of Housing and Urban Development]'s view of captive reinsurance is that the arrangements ***are permissible under RESPA*** if the payments to the reinsurer:  (1) are for reinsurance services "actually furnished or for services performed" and (2) are *bona fide* compensation that does not exceed the value of such services.

(Ciolko Decl. Ex. D (HUD Letter) at 3 (first emphasis added).)[6]  The primary bank regulators have similarly recognized the legitimacy of mortgage insurance reinsurance arrangements.[7]  Likewise, both Fannie Mae and Freddie Mac, the government-sponsored agencies responsible for setting the standards that mortgages must meet to be saleable in the secondary market, have endorsed these reinsurance arrangements.  (Garbers Decl. Ex. 7 (Fannie Mae's Qualified Mortgage Insurer Approval Requirements, at 9-10 (Dec. 2003), *available at* https://www.efanniemae.com/is/mis/pdf/mi_approval_reqs.pdf)), Garbers Jan. 19, 2011 Decl. Ex. 7 (Freddie Mac's Private Mortgage Insurer Eligibility Requirements, at 18-21 (Jan. 2008), *available at* http://www.freddiemac.com/singlefamily/pdf/mireqs.pdf).)

## ARGUMENT

Plaintiffs' claims are based exclusively on their post-closing reimbursement to defendants of mortgage insurance premiums.  Plaintiffs characterize these reimbursements as "fees for settlement services."  (TAC ¶ 85.)  Defendants are entitled to summary judgment against each plaintiff because mortgage insurance is not a "settlement service"

---

[6] HUD Letter No. 28, signed by Nicholas Retsinas, is often cited in captive mortgage reinsurance discussions, as it is the only HUD-related guidance on the topic.  While HUD is the agency charged with interpreting and enforcing RESPA (12 U.S.C. § 2617), plaintiffs ascribe undue weight to the letter.  HUD's regulations distinguish between unofficial interpretations of the type offered in Mr. Retsinas's letter, which are *not* binding, and official interpretations of RESPA, which are generally set forth in Regulation X, and which may be relied upon.  *See* 24 C.F.R. § 3500.4.  The Retsinas letter is thus entitled to very little weight.  Courts are "reluctant to follow unofficial interpretations which the agency itself does not view as binding."  *Echevararia v. Chicago Title & Trust Co.*, 256 F.3d 623, 629 (7th Cir. 2001).

[7] The Office of the Comptroller of the Currency, which is charged with the regulation of national banks, and the Office of Thrift Supervision, which is charged with the regulation of federal thrifts, have specifically approved captive reinsurance arrangements. (*See, e.g.*, Dkt. No. 82 Declaration of Wendy M. Garbers in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, filed July 22, 2008 ("Garbers Decl.") Ex. 5 (OCC Interpretive Ltr. 743, 1996 WL 636764, at *5-6 (Oct. 17, 1996) (concluding that captive reinsurance arrangements "should not diminish customers' ability to obtain optional mortgage insurance, and may even increase competition and promote the availability of mortgage insurance at competitive rates")); Ex. 6 (OTS Ltr. P-98-12, Reinsurance of Private Mortgage Insurance for Loans Originated by Affiliates, 1998 WL 998881 (Nov. 2, 1998) (concluding that the banks it supervises should be "permitted to reinsure private mortgage insurance issued by third parties for loans originated or purchased by the" banks)).)

subject to Section 8 of RESPA, as shown in section I below.  The Court may, alternatively, grant summary judgment on a narrower ground — that "settlement services" include only those services paid for at or before loan closing.  It is undisputed that plaintiffs made no payments with respect to mortgage insurance at the closing of their loans.  Additionally, defendants are entitled to summary judgment on each plaintiffs' claim because the undisputed evidence demonstrates that Cap Re was not overcompensated in connection with reinsuring their loans.  On the contrary, Cap Re lost substantial sums of money as a result of providing reinsurance on the three plaintiffs' loans.  Finally, the Court may alternatively grant summary judgment against plaintiffs on the ground that plaintiffs cannot establish the core allegation of their case:  that Cap Re *has not paid and will not pay any claims.*  The undisputed evidence establishes that Cap Re has paid or will pay reinsurance claims on the book years in which the mortgage insurance policies associated with their loans were placed.

I.     **MORTGAGE INSURANCE, LIKE OTHER POST-CLOSING SERVICES, IS NOT A "SETTLEMENT SERVICE" WITHIN THE SCOPE OF RESPA SECTION 8, AND DEFENDANTS ARE THEREFORE ENTITLED TO SUMMARY JUDGMENT.**

Section 8 prohibits "any fee, kickback, or thing of value" for referral of "business incident to or a part of a real estate ***settlement service***" or "any portion, split, or percentage of any charge" for a "***settlement service***."  12 U.S.C. § 2607(a), (b) (emphasis added).[8] RESPA's definition of "settlement service" makes it clear that what Section 8 regulates are finite services connected with the closing of a loan:

> any service provided in connection with a real estate settlement including, but not limited to, the following:  title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of

_____

[8] Section 8 is the only RESPA provision at issue here.  Other RESPA provisions touch upon post-settlement issues.  Section 6 imposes certain duties on mortgage loan servicers, and Section 10 regulates the administration of property tax, insurance, and other escrow accounts.  *See Fitch v. Wells Fargo Home Mortg., Inc.*, 709 F. Supp. 2d 510, 515-16 (E.D. La. 2010) (noting that Section 6 is not limited to settlement activity, whereas Section 8 is so limited).  None of these provisions is implicated by plaintiffs' complaint.

> credit reports or appraisals, pest and fungus inspections,
> services rendered by a real estate agent or broker, the
> origination of a federally related mortgage loan (including, but
> not limited to, the taking of loan applications, loan processing,
> and the underwriting and funding of loans), and the handling
> of the processing, and closing or settlement[.]

12 U.S.C. § 2602(3).  HUD's regulations, promulgated under explicit Congressional authorization, 12 U.S.C. § 2617(a), provide that "*[s]ettlement means* the process of executing legally binding documents regarding a lien on the property that is subject to a federally related mortgage loan.  This process may be called *'closing' or 'escrow'* in different jurisdictions."  24 C.F.R. § 3500.2 (emphasis added).

The term "service," as used at the beginning of the "settlement service" definition, is not itself further defined in RESPA, 12 U.S.C. § 2602, or HUD's regulations, 24 C.F.R. § 3500.2.  Thus, in construing the phrase "any service provided" in the definition of "settlement service," the word "service" must be given its ordinary meaning.  *See, e.g., Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995).  "Service" means "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice."  *Black's Law Dictionary* 1491 (9th ed. 2009).  This meaning of "service" is consistent with the examples found in the "settlement service" definition: each of those examples involves the provision of pre-closing labor, skill, or advice of finite duration undertaken to further the objective of closing a loan.

Mortgage insurance is not a "service."  Mortgage insurance does not provide "labor, skill, or advice," and the value that it provides is not based on the "human effort" involved.  *Cf. Hofstetter v. Chase Home Fin., LLC*, No. C 10-01313 WHA, 2010 U.S. Dist. LEXIS 84050, at *37 (N.D. Cal. Aug. 13, 2010) (flood insurance is not a "service" for purposes of a California unfair competition statute because it does not involve "work or labor").  Rather, mortgage insurance is a contractual relationship in which specified risks are shifted from a policyholder to an insurer.

Moreover, mortgage insurance is provided throughout the life of the loan, not in connection with closing.  "The common thread running through [the] services [enumerated

in the statutory definition] is that each is ancillary or peripheral to 'the ***closing*** of a real estate sale covered by RESPA.'"  *Bloom v. Martin*, 865 F. Supp. 1377, 1382 (N.D. Cal. 1994), *aff'd*, 77 F.3d 318 (9th Cir. 1996) (citation omitted; emphasis added).  HUD has by regulation defined "settlement service" as "any service provided in connection with a prospective or actual settlement."  24 C.F.R. § 3500.2.  HUD's regulations also exclude certain post-settlement conduct from treatment as a "settlement service" under Section 8. The post-closing transfer of a loan from the original lender to another holder — a "secondary market transaction" — is not subject to Section 8.  24 C.F.R. § 3500.5(b)(7). The existence of this regulatory exemption further evidences HUD's temporal construction of Section 8 as applicable only to services rendered during a finite time period in connection with the anticipated or actual closing of a covered loan.

HUD's definition of "settlement service" mentions mortgage insurance in its examples of settlement services, but it does not define mortgage insurance to be a "settlement service."  The regulation includes as a "settlement service" example the "[p]rovision of ***services*** involving mortgage insurance."  24 C.F.R. § 3500.2(10) (emphasis added).  By limiting the definition to "services" involving mortgage insurance, HUD indicated that Section 8 is limited to ancillary services — such as an insurance agent's commission for procuring mortgage insurance or the submission of an application processing fee to the mortgage insurance company — and does not include the mortgage insurance to which the ancillary services relate.  This parallels the regulation's treatment of the arranging of a loan as distinct from the actual loan.  "Settlement services" are defined to include a service provided in the "[o]rigination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans)" (24 C.F.R. § 3500.2(1)), and yet HUD does not treat the borrower's post-closing cost of keeping that loan outstanding — *i.e.*, the payment of interest — as the cost of a "settlement service."  *See United States v. Graham Mortg. Corp.*, 740 F.2d 414, 418 (6th Cir. 1984) (the making of a mortgage loan itself is not a

"settlement service" under RESPA, as the term connotes "ancillary services involved in the transfer of real property") (citations omitted).

Post-closing "life of the loan" payments are not for "settlement services."  In *Greenwald v. First Fed. Sav. & Loan Ass'n*, 446 F. Supp. 620, 625 (D. Mass. 1978), *aff'd*, 591 F.2d 417 (1st Cir. 1979), a district court addressed a claim that tax escrow deposits were subject to Section 8.  The court noted that payments into tax escrow accounts "can continue long after the closing of the mortgage transaction and . . . can continue to occur during the entire life of the mortgage."  *Id.*  The court concluded that these "life of the loan" payments were thus "obviously" not settlement-related, and not governed by Section 8.  *Id.*  Mortgage insurance premiums are indistinguishable from the tax escrow deposits at issue in *Greenwald*.

Although plaintiffs may seize upon dicta in *Alston v. Countrywide Financial Corporation*, 585 F.3d 753 (3d Cir. 2009), to argue otherwise, nothing in *Alston* requires a conclusion that payments for mortgage insurance are payments for a "settlement service." There, the Third Circuit held that the plaintiffs had standing to assert a RESPA Section 8 claim regarding mortgage insurance even though the plaintiffs had not claimed that the alleged referral resulted in an overcharge for mortgage insurance.  *Id.* at 755.  The question of whether mortgage insurance is a "settlement service" was addressed neither in the underlying district court opinion (*see Alston v. Countrywide Fin. Corp.*, No. 07-3508, 2008 U.S. Dist. LEXIS 76763 (E.D. Pa. Sept. 29, 2008)) nor in the appellate briefs.  *Alston v. Countrywide Fin. Corp.*, Case No. 08-4334, Dkt. Nos. 00319771712, 00319759801, 00319689119, 00319582568, 00319572583 (3d Cir. Oct. 28, 2009).  Nonetheless, in a footnote to the factual background section, the opinion in *Alston* stated in passing that it was "beyond dispute that the provision of mortgage insurance is a 'settlement service.'"  585 F.3d at 756 n.2.[9]  The court cited *Patton v. Triad Guaranty Insurance Corporation*, 277 F.3d

_____

[9] The court repeated the substance of that statement once more, at page 764, in its discussion of the filed rate doctrine.

1296, 1298-1300 (11th Cir. 2002), for this conclusion.  *Patton*, however, held only that Section 8 "relates to the business of insurance" within the meaning of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015.  277 F.3d at 1298-1300.  Nothing in *Patton*'s reasoning or holding addressed whether mortgage insurance is a settlement service within the meaning of Section 8.  *Id.  Alston*'s declaration that mortgage insurance is a "settlement service" is thus dictum unsupported by the authority cited, and as such, is not controlling.  *ACLU v. Schundler*, 168 F.3d 92, 98 n.6 (3d Cir. 1999) ("[W]e have repeatedly held that dicta are not binding.").[10]

Because mortgage insurance is not a "settlement service," summary judgment should be granted for defendants on plaintiffs' claims.

## II.  BECAUSE PLAINTIFFS PAID NO MORTGAGE INSURANCE PREMIUMS AT CLOSING, DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT.

### A.  Section 8 Applies Only to Settlement Service Charges Incurred or Paid At or Before a Closing.

As shown above, Section 8 applies only to services rendered in connection with a closing.  RESPA's legislative history, HUD interpretations, and relevant case law establish a corollary point:  Section 8 applies only to charges paid *at or before* closing.

Congress's focus in passing RESPA was on closing costs, not on the post-closing costs of keeping a loan outstanding.  *See* S. Rep. No. 93-866, at 1 (1974), *reprinted in* 1974

---

[10] Two district courts in other districts have held that payments for mortgage insurance made after closing may be covered by Section 8.  *See Kay v. Wells Fargo & Co.*, 247 F.R.D. 572, 576 (N.D. Cal. 2007); *Munoz v. PHH Corp.*, 659 F. Supp. 2d 1094, 1099 (C.D. Cal. 2009) (following *Kay*).  Neither opinion, however, addresses the implementing regulations or legislative history of RESPA.  Instead, both opinions simply posit that private mortgage insurance (or "PMI") must be a settlement service because "without PMI, the transaction cannot close."  *Munoz*, 659 F. Supp. 2d at 1098; *see also Kay*, 247 F.R.D. at 576 (mortgage insurance becomes "payable upon the closing of the transaction").  That logic sweeps into "settlement services" far too much.  A "transaction cannot close" without the borrower's execution of loan documents obligating the borrower to pay interest, to pay fees for eventual lien release, or possibly to make payments into escrow for taxes.  "Settlement services" are limited to those services rendered to close the loan, and do not include all of the essential elements of the loan transaction.  *Kay* and *Munoz* are inconsistent with the cases discussed below in Section III.B, and are incorrectly decided.

U.S.C.C.A.N. 6546, 6551 (raising concerns about the effect of referral fees and kickbacks on increasing "settlement costs," without any mention of post-settlement costs).  The "settlement costs" Congress analyzed were limited to "ancillary charges associated with the transaction for which payment was made *at the time of closing*."  *Real Estate Settlement Costs, FHA Mortgage Foreclosures, Housing Abandonment, and Site Selection Policies: Hearings on H.R. 13337:  Hearings Before the Subcommittee on Housing of the Committee on Banking and Currency*, 92d Cong. 769 (1972) (emphasis added).  Senators who spoke in favor of the bill also referred to it as a measure to lower closing costs.  *See, e.g.*, 120 Cong. Rec. 23550 (July 16, 1974) (Sen. Sparkman: "I think it is well simply to call it legislation having to do with settlement costs."); *id.* at 23533 (Sen. Proxmire: referring to RESPA as a "closing-cost bill"); *id.* at 24928 (Sen. Proxmire: "a bill of this type which will prevent excessive closing costs is most timely").

　　　　HUD's forms confirm that "life of loan" mortgage insurance premiums, like interest, do not relate to "settlement services."  RESPA required that HUD develop a uniform settlement statement "clearly itemiz[ing] *all* charges imposed . . . in connection with the settlement."  12 U.S.C. § 2603(a) (emphasis added).  This statutory mandate repeats the key language in the definition of "settlement service":  "any service provided in connection with a real estate settlement."  12 U.S.C. § 2602(3).  The form promulgated under § 2603(a) is thus properly seen as a further construction by HUD of the definition of a "settlement service."  The form, commonly called the HUD-1, includes entries only for mortgage insurance premiums actually paid at closing — mortgage insurance premiums paid in advance (line 902) and mortgage insurance premiums already deposited with the lender (line 1002).  *See* 24 C.F.R. § 3500, app. A.  There is no requirement to disclose all premiums that might, after closing, be paid.  Similarly, the HUD-1 requires the disclosure of interest charges only to the extent that they are *prepaid* at closing (line 901).  As with mortgage insurance premiums, there is no requirement to disclose on the HUD-1 all interest that might, after closing, be paid.

Numerous courts have also held that items paid post-settlement are not for settlement services and do not fall within Section 8's purview.  In the only circuit court decision to reach this issue, the Ninth Circuit held that Section 8 did not regulate demand and reconveyance fees, which are assessed in connection with the payoff of a loan.  *Bloom*, 77 F.3d at 320.  The Ninth Circuit noted that RESPA's definition of "settlement services" "does not focus on post-settlement fees paid by mortgagors after they have purchased their houses."  *Id.* at 320-21.  On the contrary, "RESPA's non-exhaustive list of settlement services . . . suggests a limitation to costs payable at or before settlement."  *Id.* at 321.  The court in *Molosky* agreed, concluding that "RESPA simply does not apply to fees assessed after settlement."  *Molosky v. Washington Mut. Bank*, Case No. 07-11247, 2008 WL 183634, at *5 (E.D. Mich. Jan. 18, 2008) (Section 8 does not apply to fees incurred for paying off a home loan before the maturity date "because the fees at issue were not assessed at or prior to the *settlement*." (emphasis in original)); *see also McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 590 (E.D.N.Y. 2005) (fees for discharge of loan not covered by RESPA); *Bittinger v. Wells Fargo Bank N.A.*, No. H-10-1745, 2010 U.S. Dist. LEXIS 107939, at *18-19 (S.D. Tex. Oct. 8, 2010) (dismissing RESPA claim because Section 8 is "temporally limited to the period surrounding a mortgage transaction's closing" and the fees at issue were charged "after [plaintiff's] mortgage closed"); *Fitch v. Wells Fargo Home Mortg., Inc.*, 709 F. Supp. 2d 510, 514, 516 (E.D. La. 2010) (dismissing Section 8 claim based on broker price opinion fee charged after closing, because "[o]nce the parties close the mortgage transaction, further transactions between them no longer involve 'settlement' services"); *Watt v. GMAC Mortg. Corp.*, No. 03-CV1179, 2005 U.S. Dist. LEXIS 42398, at *14-15 (W.D. Ark. Aug. 1, 2005) ("fees incurred after closing or at the time a mortgagor repaid his loan were not fees for 'settlement services' prohibited by RESPA").

There is no material difference between plaintiffs' mortgage insurance premium payments, which were made after settlement, and reconveyance or tax escrow payments, which are also made after settlement, in terms of whether Section 8 of RESPA applies.  As

*Bloom*, *McAnaney*, *Greenwald*, *Molosky*, *Bittinger*, *Fitch*, and *Watt* all held, the determining factor in whether Section 8 governs a charge is whether the charge was paid before, at, or after the settlement.  Payments made only after closing do not fall within Section 8.  Case law establishing that the statute of limitations for RESPA claims runs from the closing of a loan is consistent with this conclusion.  *See Thomas v. Ocwen Fed. Bank FSB*, Case No. 01-4249, 2002 WL 99737, at *2 (N.D. Ill. Jan. 25, 2002).

> **B.      Plaintiffs Paid No Mortgage Insurance Premiums At the Closing of Their Loans.**

None of the plaintiffs made any premium payments for mortgage insurance until after the closing of their loans (Garbers Jan. 19, 2011 Decl. Ex. 1 at 26:12-27:14, Ex. 2 at 45:5-46:22, Ex. 3 at 34:10-16), as neither GMAC Bank (in Ms. Moore's case) nor GMAC Mortgage (in Ms. Holden's and Mr. McMillon's cases) required as a condition of loan closing that any mortgage insurance premiums be prepaid.  (*Id.*)

Defendants are therefore entitled to summary judgment in their favor.

**III.     PLAINTIFFS CANNOT SHOW THAT THE PORTIONS OF THEIR MORTGAGE INSURANCE PREMIUMS CEDED TO CAP RE WERE ANYTHING OTHER THAN BONA FIDE COMPENSATION FOR REAL REINSURANCE.**

> **A.      RESPA Does Not Preclude the Payment of Compensation for Goods, Services, or Facilities.**

Nothing in RESPA prohibits parties to a settlement from making payments for real services.  On the contrary, Section 8 expressly provides:

> Nothing in this section shall be construed as prohibiting . . .
> (2) the payment to any person of a bona fide salary or
> compensation or other payment for goods or facilities actually
> furnished or for services actually performed[.]

12 U.S.C. § 2607(c).[11]  Mr. Retsinas's August 6, 1997 letter, on which plaintiffs so heavily rely, applies this principle to captive reinsurance, concluding that "so long as payments for

---

[11] "Bona fide" is generally understood as having been "[m]ade in good faith; without fraud or deceit."  Black's Law Dictionary 199 (9th ed. 2009).  Federal regulations and case law typically consider whether the payment at issue was in excess of fair market value to determine whether the payment was bona fide.  *See, e.g., St. Luke's Hosp. v. Sebelius*,

*[Footnote continued on following page.]*

reinsurance under captive reinsurance arrangements are solely 'payment for goods or facilities actually furnished or for services actually performed,' these arrangements are permissible under RESPA."  (Ciolko Decl. Ex. D at 1.)

When it enacted RESPA, Congress made it clear that "[r]easonable payments in return for services actually performed or goods actually furnished are not intended to be prohibited."  S. Rep. No. 93-866, *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551-52; *see also Culpepper v. Irwin Mortg. Corp.*, 253 F.3d 1324, 1326 (11th Cir. 2001) ("The Senate report accompanying RESPA explains that subsection (c) is there to 'specifically set forth the types of legitimate payments that would not be proscribed by the section.'") (quoting S. Rep. No. 93-866).  Regulation X, Section 8's implementing regulation, only requires that payments bear a "reasonable relationship to the market value of the goods or services provided." 24 C.F.R. § 3500.14(g)(2).

### B. Plaintiffs Cannot Meet Their Burden of Showing the Compensation Paid to Cap Re for Reinsuring Their Mortgage Insurance Pools Was Unreasonable.

The plaintiff bears the burden of showing that a challenged payment falls outside Section 8(c), as the plaintiff must establish that any compensation paid to a service provider was unreasonable.  *See Newton v. United Cos. Fin. Corp.*, 24 F. Supp. 2d 444, 463 (E.D. Pa. 1998) (finding fee to be bona fide compensation because plaintiffs failed to present evidence that fee paid by lender to mortgage loan broker "was not reasonable compensation" under RESPA); *Ramos v. Mortg. Elec. Registrations Sys.*, No. 2:08-cv-1089-ECR-RJJ, 2009 U.S.

---

*[Footnote continued from previous page.]*

611 F.3d 900, 905 (D.C. Cir. 2010) ("Fair market value is a hallmark of a bona fide transaction[.]"); 42 C.F.R. § 411.357(l) & (p) (Stark Act) (requiring that compensation received by a referring physician under indirect compensation arrangements be the "fair market value for services and items actually provided"); 11 C.F.R. § 113.19(h) (Federal Campaign Finance Law) (measuring salary payments to members of the candidate's family in relation to the fair market value of the services provided); 42 C.F.R. § 414.802 (Medicare) ("Bona fide service fees means fees paid by a manufacturer to an entity, that represent fair market value for a bona fide, itemized service actually performed."); *Ellis v. Mobil Oil*, 969 F.2d 784, 787 (9th Cir. 1992) ("It is settled law that a bona fide offer under the PMPA is measured by an objective market standard.").

Dist. LEXIS 124874, at *17-18 (D. Nev. Mar. 4, 2009) (dismissing case for failure to state a RESPA claim that was "plausible on its face" where the plaintiff failed to present any authority to support its assertion that the broker compensation was unreasonable).  Here, plaintiffs must show that the compensation Cap Re received for reinsuring the book year of policies in which their mortgage insurance was placed did not bear a reasonable relationship to the market value of the reinsurance Cap Re provided their respective mortgage insurers. 24 C.F.R. § 3500.14(g)(2); *McWhorter v. Ford Consumer Fin. Co., Inc.*, 33 F. Supp. 2d 1059, 1069 (N.D. Ga. 1997) (granting summary judgment on § 2607(a) claim in favor of lender in light of absence of evidence that the payment to plaintiff's loan broker was out of line with a market rate for his services); *see also Wingert v. Credit Based Asset Servicing & Securitization, LLC*, No. 02-1973, 2004 U.S. Dist. LEXIS 25186, at *26-28 (W.D. Pa. Aug. 26, 2004) (granting summary judgment on RESPA claims in favor of lender based on uncontroverted affidavit indicating that the fees paid were reasonably related to the market value of services); *Schmitz v. Aegis Mortg. Corp*., 48 F. Supp. 2d 877, 883-84 (D. Minn. 1999) (same).

On the indisputable facts set out above, plaintiffs cannot meet this standard, and quite obviously so.  This is not a case in which money was traded for a service (such as the labor of the mortgage broker at issue in *Schmitz*) that must be assigned a value in dollars in order to conduct the Section 8(c) comparison.  *Schmitz*, 48 F. Supp. 2d at 883-84; *see also Wingert*, 2004 U.S. Dist. LEXIS 25186, at *26-27 (defendants offered the affidavit of an expert who concluded that the fee was entirely reasonable within the industry).  Here, the parties to the reinsurance transaction traded dollars for risk, and the dollar value of the risk is now adequately knowable.  Simply put, the number of dollars Cap Re has paid or will pay plaintiffs' mortgage insurers in respect of plaintiffs' book years will *far* exceed the number of dollars Cap Re will ultimately receive from those mortgage insurers as ceded premiums for those book years. ████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████.  While in another instance it might be necessary to value prospectively the risk assumed under a reinsurance agreement, the named plaintiffs' claims here require no such abstraction.  Cap Re was not overcompensated for providing reinsurance on plaintiffs' mortgage insurance policies.  It lost money.

Because plaintiffs cannot establish an essential element of their claims, defendants are entitled to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV.     PLAINTIFFS CANNOT PROVE THE CORE FACTUAL ALLEGATION OF THEIR COMPLAINT.

For four years, plaintiffs have based their entire case on a single theory — that Cap Re's reinsurance business was a sham because Cap Re collected millions of dollars in premiums, but paid out zero in reinsurance claims.  (TAC ¶¶ 63-64.)  Defendants advised the Court at the class certification hearing that plaintiffs were wrong as a matter of fact, which prompted the Court to ask plaintiffs' counsel:

> [I]f they are correct, and if they have incurred $400 million in losses, or they will incur $400 million in losses, doesn't that end the plaintiffs' case?  Isn't this really insurance?

(Ciolko Decl. Ex. A (Transcript of March 2, 2010 Class Certification Hearing) at 5-6.)  The evidence submitted herewith establishes that the answers to the Court's questions are "yes"

and "yes."  Plaintiffs' case is at an end.  Cap Re's reinsurance program really was (and is) insurance.

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

　　　　There was and is no "sham."  There were real transfers of risk.  Cap Re has been unable to "walk away" from these staggering reinsurance liabilities.  Plaintiffs obviously cannot prove the core allegation of every version of their complaint filed since the case began.  Defendants are therefore entitled to entry of summary judgment in their favor.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in defendants' favor on plaintiffs Moore, Holden, and McMillon's claims.

Dated:  January 19, 2011                              Respectfully submitted,


                                                      By:  s/ Marc Durant
                                                           Marc Durant


                                                      Marc Durant (PA ID No. 15813)
                                                      DURANT & DURANT LLP
                                                      325 Chestnut Street, Suite 1116
                                                      Philadelphia, Pennsylvania  19106
                                                      Telephone:  214.592.1818
                                                      Email:  mdurant@durantlaw.com

                                                      Michael J. Agoglia (*Pro Hac Vice*)
                                                      Wendy M. Garbers (*Pro Hac Vice*)
                                                      Rita F. Lin (*Pro Hac Vice*)
                                                      MORRISON & FOERSTER LLP
                                                      425 Market Street
                                                      San Francisco, California  94105-2482
                                                      Telephone:  415.268.7000
                                                      Facsimile:  415.268.7522
                                                      Email:  magoglia@mofo.com